## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| CHET MICHAEL WILSON, on behalf of himself and others similarly situated, | : | CIVIL ACTION FILE NO. 1:25-cv-05503-PAE |
| Plaintiff, | : | |
| v. | : | |
| BETTER MORTGAGE CORP. | : | |
| Defendant. | : | |

**PLAINTIFF'S OPPOSITION TO THE DEFENDANT'S MOTION TO DISMISS[1]**

---

[1] On October 2, 2025, the Court permitted the Plaintiff to file a brief that was 30 pages. *See* ECF No. 21.

## Table of Contents

**Introduction** ............................................................................................................ **1**

**Background** ............................................................................................................. **3**

**Argument** ............................................................................................................... **4**

   **I.  Text Messages Are "Calls" Under the TCPA** ...................................... **4**

     **a.  Section 227(c) authorizes the FCC to prohibit unwanted telephone solicitations**

.................................................................................................................. **6**

     **b.  The private right of action in § 227(c)(5) authorizes suit when rules are violated**

................................................................................................................ **8**

     **c.  The FCC's longstanding interpretation that "calls" include texts should control**

................................................................................................................ **10**

     **d.  The applicable standard is APA arbitrary-and-capricious review** ................... **13**

     **e.  Second Circuit and SDNY precedent confirm texts qualify as calls** ................. **17**

  **II.  The Text Messages Plaintiff Received Were Classic "Telephone Solicitations"** . **20**

  **III.  Plaintiff Plausibly Pleads the Potential for Treble Damages** ............................... **23**

  **IV.  The Class Allegations Should Be Addressed on a Full Record, Not Determined Prior**

**to Discovery** ...................................................................................................... **24**

**Conclusion** ............................................................................................................. **29**

## Table of Authorities

**Cases**

*Alea London Ltd. v. Am. Home Servs., Inc.*, 638 F.3d 768 (11th Cir. 2011) ........................... 23

*Ashland Hosp. Corp. v. Serv. Employees Int'l Union*, 708 F.3d 737 (6th Cir. 2013) ............. 15

*Bank v. Simple Health Plans LLC*, 2019 U.S. Dist. LEXIS 215228 (E.D.N.Y. 2019) …......... 19

*Barr v. Am. Ass'n of Political Consultants, Inc.*, 140 S. Ct. 2335 (2020) ................................ 5

*Barton v. Temescal Wellness, LLC*, 525 F. Supp. 3d 195 (D. Mass. 2021) ............................ 5

*Breda v. Cellco P'ship*, 934 F.3d 1 (1st Cir. 2019) ...................................................... 4

*Braver v. Northstar Alarm Servs., LLC*, 329 F.R.D. 320 (W.D. Okla. 2018) ........................ 27

*Callier v. Am.-Amicable Life Ins. Co. of Tex.*, 2022 WL 17732717 (W.D. Tex. 2022) .......... 27

*Campbell-Ewald Co. v. Gomez*, 577 U.S. 153 (2016) ................................................... 4

*Carroll v. SGS N. Am., Inc.*, 2017 U.S. Dist. LEXIS 154170 (M.D. La. 2017) ..................... 21

*Charvat v. Echostar Satellite, LLC*, 630 F.3d 459 (6th Cir. 2010) .................................. 14

*Charvat v. NMP, LLC*, 656 F.3d 440 (6th Cir. 2011) .................................................. 23

*Chesbro v. Best Buy Stores, L.P.*, 705 F.3d 913 (9th Cir. 2012) .................................... 20

*Citizens Telecomms. Co. of Minn., LLC v. FCC*, 901 F.3d 991 (8th Cir. 2018).................... 15

*Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833 (1986) .................................... 6

*Comcast Corp. v. Behrend*, 569 U.S. 27 (2013) ........................................................ 25

*Cordoba v. DIRECTV, LLC*, 942 F.3d 1259 (11th Cir. 2019) ........................................... 24

*Davis v. CVS Pharmacy, Inc.*, 2025 U.S. Dist. LEXIS 167366 (N.D. Fla. 2025) ................... 4

*Davis v. HSBC Bank Nev., N.A.*, 691 F.3d 1152 (9th Cir. 2012) ...................................... 7

*D.G. v. William W. Siegel & Assocs.*, 791 F. Supp. 2d 622 (N.D. Ill. 2011) .......................... 27

*Duran v. La Boom Disco, Inc.*, 955 F.3d 279 (2d Cir. 2020) ....................................... 4, 18

*Eggleston v. Reward Zone USA LLC*, 2022 U.S. Dist. LEXIS 20928 (C.D. Cal. 2022) ........ 22

*Fillichio v. M.R.S. Assocs., Inc.*, 2010 WL 4261442 (S.D. Fla. 2010) ..................................... 15

*Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230 (2009) …………................................................. 6

*Gadelhak v. AT&T Servs., Inc.*, 950 F.3d 458 (7th Cir. 2020) …………............................... 4

*Gager v. Dell Fin. Servs., LLC*, 727 F.3d 265 (3d Cir. 2013) .................................................. 19

*Golan v. Veritas Entm't, LLC*, 788 F.3d 814 (8th Cir. 2015) ................................................... 20

*Hall v. Smosh Dot Com, Inc.*, 72 F.4th 983 (9th Cir. 2023) ..................................................... 4

*Harriel v. Bealls, Inc.*, 2025 WL 2379617 (M.D. Fla. 2025) .................................................... 15

*Hughes v. Circle K Stores, Inc.*, 740 F. Supp. 3d 721 (C.D. Ill. 2024) ................................... 28

*Hulce v. Zipongo, Inc.*, 132 F.4th 493 (7th Cir. 2025) ............................................................. 7

*Ins. Mktg. Coal. Ltd. v. FCC*, 127 F.4th 303 (11th Cir. 2025) ................................................. 4

*Jackson v. Caribbean Cruise Line, Inc.*, 88 F. Supp. 3d 129 (E.D.N.Y. 2015) ..................... 19

*Jackson v. Madison Sec. Grp., Inc.*, 2022 WL 4538290 (S.D.N.Y. 2022) .............................. 24

*Jones v. Blackstone Med. Servs., LLC*, 2025 WL 2042764 (C.D. Ill. 2025) ........................... 14

*Keating v. Peterson's Nelnet, LLC*, 615 F. App'x 365 (6th Cir. 2015) ................................... 16

*Klassen v. Solid Quote LLC*, 2023 WL 7544185 (D. Colo. 2023) ........................................... 27

*Krady v. Eleven Salon Spa*, 2017 U.S. Dist. LEXIS 120139 (E.D.N.Y. 2017) ....................... 19

*Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643 (4th Cir. 2019) ........................... 9, 24, 26, 28

*Lary v. Trinity Physician Fin. & Ins. Servs.*, 780 F.3d 1101 (11th Cir. 2015) ....................... 23

*Lenorowitz v. Mosquito Squad*, 2022 U.S. Dist. LEXIS 170384 (D. Conn. 2022) ………….. 26

*Lopez v. Consumer Safety Tech., LLC*, 2024 U.S. Dist. LEXIS 84873 (M.D. Fla. 2024) ...... 28

*Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024) ....................................... 10, 13, 14, 17

*Lyman v. QuinStreet, Inc.*, 2024 WL 3406992 (N.D. Cal. 2024) ............................................. 15

iii

*Mais v. Gulf Coast Collection Bureau, Inc.*, 768 F.3d 1110 (11th Cir. 2014) ........................14

*McLaughlin Chiropractic Assocs., Inc. v. McKesson Corp.*, 606 U.S. 146 (2025) ................. 3

*Metten v. Town Sports Int'l, LLC*, 2019 WL 1299939 (S.D.N.Y. 2019) ................................. 19

*Meyer v. Portfolio Recovery Assocs., LLC*, 707 F.3d 1036 (9th Cir. 2012) ........................... 27

*Miholich v. Senior Life Ins.*, 2022 U.S. Dist. LEXIS 23981 (S.D. Cal. 2022) ....................... 22

*New Prime Inc. v. Oliveira*, 586 U.S. 105 (2019) ...................................................... 14

*Orea v. Nielsen Audio, Inc.*, 2015 WL 1885936 (N.D. Cal. 2015) .......................................... 21

*Olney v. Progressive Cas. Ins. Co.*, 993 F. Supp. 2d 1220 (S.D. Cal. 2014) ........................... 27

*Pacleb v. Cops Monitoring*, 2014 U.S. Dist. LEXIS 91976 (C.D. Cal. 2014) ........................ 23

*Payne v. Sieva Networks, Inc.*, 347 F.R.D. 224 (N.D. Cal. 2024) ............................................. 26

*Pickens v. Hamilton-Ryker IT Sols., LLC*, 133 F.4th 575 (6th Cir. 2025) .............................. 14

*Rombough v. Robert D. Smith Ins. Agency, Inc.*, 2022 WL 2713278 (N.D. Iowa 2022) ........ 27

*Rosenberg v. LoanDepot.com LLC*, 435 F. Supp. 3d 308 (D. Mass. 2020) ............................. 25

*Rotberg v. Jos. A. Bank Clothiers, Inc.*, 345 F. Supp. 3d 466 (S.D.N.Y. 2018) ...................... 19

*Roylance v. ALG Real Estate Servs., Inc.*, 2015 WL 1522244 (N.D. Cal. 2015) ................... 23

*Sandusky Wellness Ctr., LLC v. Medco Health Sols., Inc.*, 788 F.3d 218 (6th Cir. 2015) ..... 21

*Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946 (9th Cir. 2009) ......................................... 7

*Saunders v. Dyck O'Neal, Inc.*, 319 F. Supp. 3d 907 (W.D. Mich. 2018) ............................... 16

*Seven Cty. Infrastructure Coal. v. Eagle Cty.*, 145 S. Ct. 1497 (2025) .................................... 13

*Skidmore v. Swift & Co.*, 323 U.S. 134 (1944) .......................................................................... 16

*Van Patten v. Vertical Fitness Grp., LLC*, 847 F.3d 1037 (9th Cir. 2017) ............................... 18

*Wakefield v. ViSalus, Inc.*, 2019 U.S. Dist. LEXIS 104862 (D. Or. 2019) .............................. 23

*Watson v. Bluestem Brands, Inc.*, 2022 WL 4586407 (S.D.N.Y. 2022) ................................... 27

*Whittaker v. Freeway Ins. Servs. Am., LLC*, 2023 WL 167040 (D. Ariz. 2023) ...................... 21

*Williams v. Myler Disab., LLC*, 2020 U.S. Dist. LEXIS 211914 (W.D.N.C. 2020) ................. 6

*Wilson v. Skopos Fin., LLC*, 2025 U.S. Dist. LEXIS 138638 (D. Or. 2025) .......................... 18

*Zimmer Radio of Mid-Missouri, Inc. v. FCC*, 145 F.4th 828 (8th Cir. 2025) ........................ 15

*Zyburo v. NCSPlus, Inc.*, 44 F. Supp. 3d 500 (S.D.N.Y. 2014) ................................................. 27

**Statutes**

Telephone Consumer Protection Act of 1991, 47 U.S.C. § 227 ............................................... 3

TRACED Act, Pub. L. No. 116-105, 133 Stat. 3274 (2019) ...................................................... 6

**Regulations**

47 C.F.R. § 64.1200(a)(2) ......................................................................................................... 21

47 C.F.R. § 64.1200(c)(2) ......................................................................................................... 27

47 C.F.R. § 64.1200(e) .............................................................................................................. 11

47 C.F.R. § 64.1200(f)(15) ........................................................................................................ 20

**Administrative Materials**

In re Rules & Regulations Implementing the TCPA, 18 F.C.C. Rcd. 14014 (2003) ........... 7

In re Targeting & Eliminating Unlawful Text Messages, 38 F.C.C. Rcd. 12247 (2023) ... 18

**Introduction**

The Telephone Consumer Protection Act's provisions authorizing a nationwide Do Not Call List, 47 U.S.C. § 227(c), empower the FCC to establish by regulation "a list of telephone numbers of residential subscribers who object to receiving telephone solicitations," *id.* § 227(c)(3), and to prohibit telemarketers from "making or transmitting a telephone solicitation" to phone numbers on that list. *Id.* § 227(c)(3)(F). For decades, the FCC has consistently made those protections available to all residential phone subscribers, regardless of whether their phone numbers are associated with landline phones or cell phones. *See* 47 C.F.R. §§ 64.1200(c)(2), (e); *In re Rules and Regulations Implementing the TCPA*, 18 FCC Rcd. 14014, 14037 ¶¶ 33–36 (2003); The FCC has also determined that those provisions authorize it to prohibit unsolicited text messages, not just voice calls. *See* 47 C.F.R. § 64.1200(e); 18 F.C.C. Rcd. at 14115; *In re Targeting and Eliminating Unlawful Text Messages*, 38 F.C.C. Rcd. 12247, 12256–57 (2023).

In the decades since FCC established the Do Not Call List and began enforcing those protections, over 200 million phone subscribers have come to rely on them. *Cacho v. McCarthy & Kelly LLP*, 739 F. Supp. 3d 195, 203–204 & n.5 (S.D.N.Y. 2024). Plaintiff Sheri Butler Brockington is one of them. So when Defendant Better Mortgage, Inc. ("Defendant" or "Better Mortgage") sent the Plaintiff telemarketing texts in violation of the FCC's rules, the Plaintiff brought this lawsuit to vindicate those rights and put a stop to Better Mortgage's unwelcome and intrusive marketing practices.

Better Mortgage Corp. ("Better Mortgage") has now filed a Motion to Dismiss, and it's one that makes a big ask of this Court. The Supreme Court recently held that courts are not automatically bound by the FCC's interpretations, and should make their own assessment of what the TCPA means. *McLaughlin Chiropractic Assocs., Inc. v. McKesson Corp.*, 606 U.S.

146, 152 (2025). So, Better Mortgage therefore asks this Court to reject the FCC's longstanding interpretations and hold that the Do Not Call List protects only voice calls, upending protections for potentially hundreds of millions of Americans.

This Court should decline that request. A fresh read of the statutory text confirms that consumers listing their number on the Do Not Call List protects them from intrusive text messages, not just voice calls. Better Mortgage asks this Court to substitute its judgment for Congress's and the FCC's largely because text messages didn't exist yet when the TCPA was passed. But that is not how statutory interpretation works, and it's contrary to the plain meaning of the terms Congress used. And even if the statute itself weren't clear on this, later enactments and multiple express delegations of discretion to the FCC show that Congress would have intended the FCC's consistent and well-reasoned judgment to win out.

The Second Circuit has already treated text messages as "calls" for TCPA purposes. *See Melito v. Experian Mktg. Sols., Inc.,* 923 F.3d 85, 88–89 (2d Cir. 2019) (recognizing FCC interpretation that texts are covered and relying on Supreme Court precedent), and *Duran v. La Boom Disco, Inc.,* 955 F.3d 279, 283–84 (2d Cir. 2020) (quoting the Supreme Court, "[i]t is undisputed that a text message…qualifies as a 'call'" and holding an unwanted text is a concrete injury). Those decisions align this Circuit with the Supreme Court's framing and the prevailing national consensus that texts fall within the TCPA's ambit. This has not changed. Indeed, just last month, *Bosley v. A Bradley Hospitality LLC d/b/a La Mesa Miami*, Case No. 25-cv-22336-BLOOM/Elfenbein, 2025 U.S. Dist. LEXIS 183986 (S.D. Fla. Sept. 18, 2025) confirmed that "a text message constitutes a 'call' under the TCPA." *Id.*

Defendant's remaining argument fares no better. The messages at issue are classic "telephone solicitations" because they were designed to encourage a purchase—initiating or

completing a mortgage application—and they carried Better Mortgage's NMLS identifier, a regulatory hallmark of marketing outreach. See 47 C.F.R. § 64.1200(f)(15). Plaintiff also plausibly alleges knowing and willful conduct: Better Mortgage sent multiple solicitations to a DNC-registered number without scrubbing its lists and invoked a non-existent "recent application," facts that readily support treble damages at the pleading stage. Finally, the request to strike class allegations is premature. Courts routinely resolve issues like consent, residential use, and ascertainability at Rule 23 on a factual record that includes uniform scripts, campaign data, and centralized consent/opt-out logs—exactly the common proof alleged here.

The Defendant's motion to dismiss should be denied.

## Background

Plaintiff Chet Michael Wilson is the subscriber and customary user of cell number (541) XXX-9999, which he has used exclusively for personal and household purposes for more than five years (ECF No. 16 at ¶ 8). He does not maintain a landline, and his cellular number serves as his residential line (Id. ¶¶ 9–13). Despite this registration, Defendant Better Mortgage Corp. delivered—or caused to be delivered—multiple text messages to Plaintiff's number in April 2022, including on April 2 and April 4 (ECF No. 16 at ¶¶ 16–17). The texts were explicitly branded as coming "from Better Mortgage," were signed by individuals identifying themselves as "Chloe" and "Joshua," and included Defendant's NMLS identifier (#330511). (Id. ¶¶ 29–30).

The text messages referenced a "recent application" for a mortgage loan, even though Plaintiff had never applied for any loan with Better Mortgage (ECF No. 16 at ¶¶ 31–34, 45–47). Plaintiff never gave Better Mortgage his number, never submitted a loan application, and never provided consent to receive solicitations (ECF No. 16 at ¶¶ 45–47). He alleges that the messages were unwanted telemarketing designed to advertise Defendant's business, and that they invaded

his privacy, caused nuisance, and disrupted his personal use of his phone (Id. ¶ 48). He further alleges that Defendant "knew or should have known" his number was on the DNC Registry but nonetheless proceeded with its campaign in reckless disregard of consumer rights (Id. ¶ 49).

### Argument

### I.    Text Messages Are "Calls" Under the TCPA, As Nearly Every Court to Consider the Question Has Held.

Defendant contends that a text message is not a "call" under the TCPA and that the FCC overstepped when it interpreted a "call" to include text messages. The Supreme Court, every Circuit Court, and the majority of district courts, even after *McLaughlin Chiropractic Assocs., Inc. v. McKesson Corp.,* 145 S. Ct. 2006 (2025), disagree with Defendant's position. *See Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 156 (2016) ("A text message to a cellular telephone, it is undisputed, qualifies as a 'call'".); *Ins. Mktg. Coal. Ltd. v. FCC*, 127 F.4th 303, at n.2 (11th Cir. 2025) ("We use the terms 'robocalls' and 'robotexts' as shorthand for calls and texts made 'using any automatic telephone dialing system or an artificial or prerecorded voice'—*i.e.*, the calls and texts that the TCPA regulates….We note that even though the statute on its face does not mention text messages, the FCC—by regulation—has interpreted the word 'call' to include text messages."); *Drazen v. Pinto*, 74 F.4th 1336, 1346 (11th Cir. 2023) ("we hold that the receipt of an unwanted text message causes a concrete injury"); *Hall v. Smosh Dot Com, Inc.*, 72 F.4th 983, 986 (9th Cir. 2023); *Breda v. Cellco Partnership*, 934 F.3d 1, n.1 (1st Cir. 2019) ("The TCPA also applies to . . . text messages."); *Gadelhak v. AT&T Servs.*, 950 F.3d 458, 463 (7th Cir. 2020) ("We therefore agree with the Second and Ninth Circuits that unwanted text messages can constitute a concrete injury-in-fact.").

Defendant relies on the order in *Davis v. CVS Pharmacy, Inc.*, No. 4:24-cv-477-AW-MAF,

2025 U.S. Dist. LEXIS 167366 (N.D. Fla. Aug. 26, 2025); one of two cases that refused to apply the above cited longstanding precedent. Contrary to what the court held in *Davis*, the Supreme Court's holding in *Campbell-Ewald* is not mere dicta. "The Supreme Court ratified the FCC's interpretation that a text message was a call for the purposes of the TCPA in *Campbell-Ewald v. Gomez* [.]" *Barton v. Temescal Wellness, LLC*, 525 F. Supp. 3d 195, 198 (D. Mass. 2021). Indeed, "it is unlikely that the Court would stay silent about any serious concerns that robotexts were an invalid ground for TCPA recovery in a case construing the same statute." *Id.* at 199. "Furthermore, in the most recent term Justice Kavanaugh's plurality opinion in *Barr* cited the FCC's regulations applying the TCPA to text messages as the current applicable legal standard." *Id.* (citing *Barr v. American Ass'n of Political Consultants, Inc.*, 140 S.Ct. 2335, 2344 n.1, 207 L. Ed. 2d 784 (2020)). "The First, Second, Seventh, Ninth, and Eleventh Circuits have either adopted Judge Ginsburg's remark as black letter law rather than dicta or had already held that the TCPA included text messages before *Campbell-Ewald*." *Id.* at *6 (collecting cases). Indeed, just last month *Bosley v. A Bradley Hospitality LLC d/b/a La Mesa Miami*, Case No. 25-cv-22336-BLOOM/Elfenbein, 2025 U.S. Dist. LEXIS 183986 (S.D. Fla. Sept. 18, 2025) confirmed that "a text message constitutes a 'call' under the TCPA." *Id.* This ruling is consistent with the overwhelming majority of decisions nationwide.

"In addition to the Supreme Court and the FCC, *Congress* has also made clear the TCPA's applicability to text messages." *Williams v. Myler Disab., LLC*, No. 3:20-cv-00275-FDW-DCK, 2020 U.S. Dist. LEXIS 211914, at n. 2 (W.D.N.C. Nov. 12, 2020) (emphasis added). Specifically, when Congress amended the TCPA in 2019 with the TRACED Act, it adopted the FCC's interpretation, instructing the FCC to prescribe regulations related to "a call made or *a text message sent* in violation of [227(b).]" 47 § 227(i)(1)(A) (emphasis supplied).

"Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change." *Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 239–40 (2009). "Where, as here, 'Congress has not just kept its silence by refusing to overturn the administrative construction, but has ratified it with positive legislation,' we cannot but deem that construction virtually conclusive." *Commodity Futures Trading Com v. Schor*, 478 U.S. 833, 846 (1986). When Congress amended the TCPA in 2019, not only was it aware that the FCC and every court had interpreted the statute to cover text messages, it *ratified* that interpretation with an explicit reference to text messages in the amendment. Because Congress has spoken directly on the issue, the application of the TCPA to text messages is all but conclusive and reason alone to reject Defendant's position.

> ### a. Section 227(c) authorizes the FCC to prohibit unwanted telephone solicitations of all kinds, including text messages.

The core of § 227(c) is its prohibition on sending "telephone solicitations" to numbers on the Do Not Call List.  47 U.S.C. § 227(c)(1), (3)(F). The statute defines a "telephone solicitation" in relevant part to mean "the initiation of a telephone *call or message* … which is transmitted to any person." 47 U.S.C. § 227(a)(4) (emphasis added). That definition plainly encompasses modern text messages. As further explained below, the word "call" in the TCPA encompasses text messages. *See infra*, *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 952 (9th Cir. 2009) ("we hold that a text message is a 'call' within the TCPA"). That interpretation follows from "the ordinary, contemporary, common meaning of the verb 'to call.'" *Satterfield*, 569 F.3d at 953–54 & n.3. And even if the word "call" alone weren't enough, contemporary dictionary definitions of the word "message" emphasized that it encompassed *all* sorts of communication, both spoken *and* written. *See* Black's Law Dictionary, 6th Ed. ("any notice, word, or communication, no

matter the mode and no matter how sent, from one person to another").[2] More generally, the definition of "telephone solicitation" focuses not on the form of a communication but whether it is made "for the purpose of encouraging" a commercial transaction. *See, e.g.*, *Hulce v. Zipongo, Inc.*, 132 F.4th 493 (7th Cir. 2025). So Congress referred to "call or message" disjunctively to broadly capture a wide range of potential communication mediums. *See, e.g.*, *Davis v. HSBC Bank Nevada, N.A.*, 691 F.3d 1152, 1168 (9th Cir. 2012).

The purpose and structure of the Do Not Call List provisions supports that interpretation. Congress's stated goal was "to protect residential telephone subscribers' privacy rights to avoid receiving telephone solicitations to which they object." 47 U.S.C. § 227(c)(1). And "a voice message or a text message are not distinguishable in terms of being an invasion of privacy." *Satterfield*, 569 F.3d at 954; *see Wilson v. Skopos Fin., LLC*, No. 6:25-cv-376, 2025 WL 2029274, at *4 (D. Or. July 21, 2025). To be sure, as Defendant emphasizes, Section 227(c) does not specifically use the words "text messages" or "SMS messages." That is unsurprising, because the TCPA was enacted in 1991, and the first-ever text message wasn't sent until 1992. *See Keating v. Peterson's Nelnet, LLC*, 615 F. App'x 365, 370 (6th Cir. 2015). But as just explained, the statute *does* explicitly cover any "telephone solicitation," which is expressly defined to include any "call *or message*." 47 U.S.C. § 227(a)(4). That breadth reflects Congress's choice to regulate solicitations by effect (commercial encouragement) rather than by transmission modality. See 47 U.S.C. § 227(a)(4); *Hulce v. Zipongo, Inc.*, 132 F.4th 493 (7th Cir. 2025).

> **b. Just as § 227(c)'s substantive provisions allow the FCC to regulate text messages, the private right of action in § 227(c)(5) authorizes suit when those rules are violated.**

---

[2] *See also, e.g.*, Webster's College Dictionary (1991) ("a communication delivered in writing, speech, by means of signals, etc."); Oxford English Dictionary, 2d Ed. (1989) ("a communication transmitted through a messenger or other agency; an oral or written communication sent from one person to another"); Oxford American Dictionary (1980) ("a spoken or written communication").

Section 227(c)(5) grants a right of action to enforce the Do Not Call List regulations to any "person who has received more than one telephone call within any 12-month period … in violation of the regulations." 47 U.S.C. § 227(c)(5). That is "a straightforward provision designed to achieve a straightforward result"—to enable "each person to protect his own personal rights" under § 227(c). *Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 650 (4th Cir. 2019).

It is well established that the word "call" in the TCPA includes text messages. As the Ninth Circuit has explained, the "ordinary, contemporary, common meaning" of the word "call" is simply "to communicate or try to get into communication with a person by a telephone." *Satterfield*, 569 F.3d at 953–54 & n.3 (quoting Webster's Third New International Dictionary 318 (2002)).[3] Accordingly, the FCC has recognized since 2003 that when the statute says "call," it means not only traditional voice calls but also modern text messages. 18 F.C.C. Rcd. at 14115 ¶ 165 (defining telemarking calls to encompass both).

That meaning of "call" is especially clear in neighboring provisions. Notably, there is only one other reference to "calls" in § 227(c), and it has the same breadth as "telephone solicitations." In § 227(c)(1)(D), Congress directed the FCC to assess whether it needed additional statutory authority "to further restrict telephone solicitations, including those *calls* exempted under subsection (a)(3)" (emphasis added). In the original TCPA, subsection (a)(3) contained the statutory definition of "telephone solicitation." *See* Telephone Consumer Protection Act of 1991, Pub. L. 102–243, 105 Stat. 2394, § 3(a). So § 227(c)(1)(D)'s reference to

---

[3] *See also, e.g.*, Webster's College Dictionary (1991) ("to communicate or try to communicate with by telephone"); The New Merriam-Webster Dictionary (1989) ("to get or try to get in communication with by telephone"); Oxford English Dictionary, 2d Ed. (1989) ("a summons or communication by telephone").

"calls exempted under" the definition of "telephone solicitation" presumably mirrored that definition—which, as explained above, broadly encompasses a "telephone call or message" and thus covers text messages even more clearly than the word "call" standing alone. 47 U.S.C. § 227(a)(4); *see supra*.[4]

To the extent *Jones v. Blackstone Med. Servs., LLC*, 2025 WL 2042764 (C.D. Ill. July 21, 2025), suggested otherwise, it relied on contemporary parlance rather than the term's ordinary meaning at enactment—an approach the Supreme Court has warned against. See *New Prime Inc. v. Oliveira*, 586 U.S. 105, 114 (2019). But that gets statutory interpretation wrong in two important ways. First, as the Supreme Court has warned, "modern intuition" doesn't always match "evidence of a term's meaning at the time of [a statute]'s enactment." *New Prime Inc. v. Oliveira*, 586 U.S. 105, 114 (2019). *Jones* and other cases go astray when they reflexively apply present-day intuitions about how text messages are discussed to language from 1991, before the first text message was ever sent.[5] And second, as explained above, it's irrelevant that Congress didn't have text messages specifically in mind in 1991. *See supra* (citing cases). "The mere fact that Congress did not envision the ubiquitousness of text messaging in 1991 does not mean the FCC's conclusion lacks support." *Wilson*, 2025 WL 2029274, at *4.

*Jones* also disregarded the FCC's longstanding interpretation of "call" to include text messages because the FCC, until 2023, had only articulated that interpretation in the context of

---

[4] Because § 227(c)(1)(D) confirms that the variation between Congress's use of a "call or message" in § 227(a)(4)'s capacious definition and its use of "call" in § 227(c)(5) is immaterial, the one district court that recently relied on this distinction to adopt a restrictive interpretation is unpersuasive. *Contra Davis v. CVS Pharmacy, Inc.*, No. 4:24-cv-477, 2025 WL 2491195, at *2 (N.D. Fla. Aug. 26, 2025).

[5] *Compare, e.g.*, *Davis*, 2025 WL 2491195, at *1 (relying on how "a normal person refers to a text message"), *with* 47 U.S.C. § 227(b)(1)(A)(iii) (using the word "call" to refer to a message sent to a "paging service," the most analogous type of text-message-like communication in 1991).

the statute's autodialer prohibitions. 2025 WL 2042764, at *4–5. But that's unsurprising. The Do Not Call List provisions are built around the defined term "telephone solicitation," so the standalone word "call" is much more extensively used in § 227(b)'s autodialer and robocall prohibitions, or in associated definitional provisions.[6] That's why the FCC first determined that "call" includes text messages in the § 227(b) context, and only more recently memorialized in a formal regulation that "call" has the same meaning in the Do Not Call List context. *See* 47 C.F.R. § 64.1200(e); *In re: Targeting and Eliminating Unlawful Text Messages*, 88 Fed. Reg. 20800, 20802 ¶ 6 (2023); *In re: Targeting and Eliminating Unlawful Text Messages*, 38 F.C.C. Rcd. 12247, 12256–57 ¶ 26 (2023). But that doesn't mean there's any daylight between § 227(b) and § 227(c) on this particular question, and neither *Jones* nor Defendant identifies any. *See United States v. Paulson*, 68 F.4th 528, 555 (9th Cir. 2023) (absent cause to think otherwise, "a word or phrase is presumed to bear the same meaning throughout a text"). In fact, reading the word "call" differently in § 227(c)(5) than in neighboring provisions would make no sense. *See, e.g.*, 38 F.C.C. Rcd. at 12257 (rejecting that "anomalous" interpretation). If Congress intended to cabin § 227(c)(5)'s private right of action to *exclude* text messages, it wouldn't have conveyed that by using a term that elsewhere in the statute *includes* them.

> ### c.  Even if the statute left room to doubt that a text message can be a violation (which it doesn't), the FCC's longstanding interpretation of the word "call" should still carry the day.

Since 2003, the FCC held that text messages constitute calls within the meaning of the TCPA. *In Re Rules & Reguls. Implementing Tel. Consumer Prot. Act of 1991*, 18 F.C.C. Rcd. 14014, 14115 (2003) (defining telemarking calls to "encompass[] both voice calls and text calls to

---

[6] *See* Telephone Consumer Protection Act of 1991, Pub. L. 102–243, 105 Stat. 2394, § 3(a) (using "call" or "calls" in the original text of 47 U.S.C. §§ 227(a)(1), 227(a)(3), 227(b)(1)(A), 227(b)(1)(B), 227(b)(2)(A), 227(b)(2)(B), 227(c)(1)(D), 227(c)(5), 227(d)(1)(A), 227(d)(3)).

wireless numbers including, for example, short message service (SMS) calls") (the "2003 Order"). In *Satterfield*, the Ninth Circuit found that the FCC's interpretation was reasonable and consistent with the dictionary's definition of "call," how text messages are sent and used, and the purposes of the TCPA. 569 F.3d at 954.

To be sure, mere ambiguity is no longer automatic cause to defer to an agency. *See Loper Bright*, 603 U.S. at 412–13 (overruling *Chevron*). But courts still defer when a statute "expressly delegate[s] to an agency the authority to give meaning to a particular statutory term," tasks an agency "to fill up the details of a statutory scheme," or tells an agency "to regulate subject to the limits imposed by a term or phrase that leaves agencies with flexibility, such as 'appropriate' or 'reasonable.'" *Id.* at 395. In that case, a court's role is merely to "fix[] the boundaries" of agency authority and ensure "reasoned decisionmaking" within those outer bounds. *Id.*; *see Pickens v. Hamilton-Ryker IT Sols., LLC*, 133 F.4th 575, 587–88 (6th Cir. 2025).

This case falls at the intersection of *two* such express delegations. Mainly, § 227(c) itself is an express delegation of rulemaking discretion to the FCC: Congress tasked the FCC with evaluating alternative approaches based on (among other things) their "effectiveness in protecting … privacy rights" and their "other advantages and disadvantages." 47 U.S.C. § 227(c)(1)(A). It then told the FCC to make rules "that *the Commission determines* are most effective and efficient to accomplish the purposes of this section." 47 U.S.C. § 227(c)(1)(E) (emphases added). That language grants discretionary authority to "fill up the details," accompanied by "flexibility" to determine what rules will best effectuate the TCPA's goals. *Loper Bright*, 603 U.S. at 395.  Congress in 1993 asked the FCC to decide whether cell phone companies are "common carriers" whose subscribers have rights under the TCPA, and the FCC did. *Compare* 47 U.S.C. § 332(a)(1)(A), *with* 47 U.S.C. § 227(c)(3). That expressly delegated the

FCC "authority to give meaning to a particular statutory term." *Loper Bright*, 603 U.S. at 395. If Congress didn't speak on this issue, then it clearly looked to the FCC's expert judgment to supply an answer. *See U.S. Telecom Ass'n v. FCC*, 825 F.3d 674, 718 (D.C. Cir. 2016) (express delegation was evidence that Congress expected telecommunications technology to evolve).

It follows that the way to honor Congress's intent here is to "respect [that] delegation" and affirm the FCC's "reasoned decisionmaking" on this question. *Loper Bright*, 603 U.S. at 395. Recognizing as much, courts have continued to defer to the FCC's well-reasoned decision to allow registration of cell phone numbers, even after *Loper Bright* and *McLaughlin*.  *See, e.g.*, *Harriel v. Bealls, Inc.*, No. 8:25-cv-1165, 2025 WL 2379617, at *2 (M.D. Fla. Aug. 15, 2025); *Wilson*, 2025 WL 1784815, at *5; *Lyman v. QuinStreet, Inc.*, No. 23-cv-5056, 2024 WL 3406992, at *4 (N.D. Cal. July 12, 2024). This Court should do the same.

As explained, the FCC is regulating here with discretionary authority expressly delegated by Congress. *See supra*. Acting under that express delegation, the FCC has reasonably explained that prohibiting texts to numbers on the Do Not Call List "make[s] … enforcement easier," "eliminate[s] any potential confusion in the industry," and aligns with both its longstanding determination that cell phone numbers are eligible for protection and the established meaning of the word "call" in other TCPA contexts. 38 F.C.C. Rcd. at 12256–57 ¶¶ 26–27. Because the FCC acted reasonably and consistently in reaching that conclusion, this Court should affirm that "reasoned decisionmaking." *Loper Bright*, 603 U.S. at 395. Or, at a minimum, this Court should look to the FCC's longstanding and consistent interpretation of the word "call" as an "informed judgment to which [it can] properly resort for guidance." *Id.* at 388 (citing *Skidmore*, 323 U.S. at 139–40).

In any event, the FCC's interpretation is, at the very least, an "informed judgment" that

should be accorded "great weight" by this court. *Loper Bright*, 603 U.S. at 388; *see Skidmore v. Swift Co.*, 323 U.S. 134, 139–40 (1944). The FCC's position is grounded in the agency's specialized expertise, consistent across decades, and well-reasoned. So, it has all the hallmarks of an agency decision with "the power to persuade." *Loper Bright*, 603 U.S. at 388.

### d. The Applicable Standard Is the APA's Arbitrary-and-Capricious Review, and the FCC's Text-Message Clarification Easily Clears It.

"When an agency exercises discretion granted by a statute, judicial review is typically conducted under the Administrative Procedure Act's deferential arbitrary-and-capricious standard. ***Under that standard, a court asks not whether it agrees with the agency decision, but rather only whether the agency action was reasonable and reasonably explained***." *Seven Cty. Infrastructure Coal. v. Eagle Cty.*, 145 S. Ct. 1497 (2025) (emphasis added) (citing *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 391-392) (citing *Motor Vehicle Mfrs. Ass'n of United States, Inc.* v. *State Farm Mut. Auto. Ins. Co.*, 463 U. S. 29, 43 (1983); *see also Zimmer Radio of Mid-Missouri, Inc. v. FCC,* 145 F.4th 828 (8th Cir. 2025) ("We consider a challenge to the agency's decision making under the APA's arbitrary-and-capricious standard next. But because Congress granted the FCC discretion to interpret Section 202(h) within the public interest, we decline to grant the petition on the basis that the FCC's definition of 'competition' is inconsistent with Section 202(h).").

Under the correct standard of review, it cannot be said that the FCC, under its grant of authority from Congress, acted unreasonably or inconsistent with the statute when it extended the TCPA's protections, including the DNC Provision, to texts. ***Congress adopted the FCC's interpretation*** when it amended the TCPA. *See Williams v. Myler Disab., LLC*, No. 3:20-cv-00275-FDW-DCK, 2020 U.S. Dist. LEXIS 211914, at n. 2 (W.D.N.C. Nov. 12, 2020) ("In addition to the Supreme Court and the FCC, ***Congress*** has also made clear the TCPA's applicability to text messages.") (citing *TRACED Act*, PL 116-105, December 30, 2019, 133 Stat 3274. The Supreme

13

Court and every Circuit Court have so agreed.

In *Davis*, the court applied the wrong standard of review, relying instead on *McLaughin Chiropractic Assocs., Inc. v. McKesson Corp.*, 606 U.S. 146 (2025). *See* 2025 U.S. Dist. LEXIS 167366, at *9 (N.D. Fla. Aug. 26, 2025). The applicable standard is not "appropriate respect" as the *Davis* court held, but instead an inquiry into whether the FCC acted reasonably and reasonably explained its exercise of discretion. Such is the case here because Congress instructed the FCC to "initiate a rulemaking proceeding concerning the need to protect residential telephone subscribers' privacy rights to avoid receiving telephone solicitations to which they object." 47 U.S. Code § 227(c)(1) (titled "Protection of Subscriber Privacy Rights").

Indeed, "Congress vested the FCC with considerable authority to implement the Telephone Act." *Charvat v. Echostar Satellite, LLC*, 630 F.3d 459 (6th Cir. 2010). In furtherance of that goal, Congress directed the FCC to "develop proposed regulations to implement the methods and procedures that the Commission determines are most effective and efficient to accomplish the purposes of this section." *See Mais v. Gulf Coast Collection Bureau, Inc.*, 768 F. 3d 1110, 1123 (11th Cir. 2014) (citing 47 U.S.C. § 227(c)(1)(E)). Because the FCC exercised its discretion granted by statute and was rulemaking, the APA's deferential arbitrary-and-capricious standard applies. To be sure, "[t]he scope of this review 'is narrow,' and [we] must exercise appropriate deference to [the FCC's] decisionmaking and not substitute [our] own judgment for that of the [Commission]." *Zimmer Radio of Mid-Missouri, Inc. v. FCC,* 145 F.4th 828 (8th Cir. 2025).

Under this standard, it cannot be said that the FCC's action was unreasonable or not reasonably explained. In the 2023 Order, the FCC explained its reasoning for clarifying and codifying the DNC protections to cover text message solicitations:

> Consumers increasingly rely on text messaging to stay in touch with friends and family, to do business, communicate with their child's school, and get information from their

government.  On many devices, people immediately see some or all of the messages once received on the device, whereas they have the option to ignore unwanted calls.  This causes consumers to open their texts quickly because texts are an expected trusted source of communications, not annoyance and scams.  The rise of junk texts jeopardizes consumer trust in text messaging[,] frustrate[s] consumers, and [causes] serious harm.

*Id*. at ¶1. Accordingly, "the Commission has considered the relevant factors and articulated a rational connection between the facts found and the choice made." *See Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 105 (1983).

In fact, in *Jones v. Blackstone Med. Servs., LLC*, which Defendant cites in support of its motion, court found "[t]he Plaintiffs' position — that text messages are calls as the latter term is used in the TCPA — ***is an eminently reasonable one***, particularly given the TCPA's purpose and the prevalence of text messaging in the U.S. today." No. 1:24-cv-01074-JEH-RLH, 2025 U.S. Dist. LEXIS 138371, at *14 (C.D. Ill. July 21, 2025) (emphasis supplied). Defendant concedes that for another section of the statute, it is not unreasonable to include texts as calls.

Had the court in that case applied the correct standard of review to the FCC's action, it should have followed the FCC's interpretation because nothing about it is arbitrary and capricious. *See Zimmer Radio of Mid-Missouri, Inc. v. FCC*, 145 F.4th 828 (8th Cir. 2025) ("An agency action may be arbitrary and capricious in many ways: by (1) 'rel[ying] on factors which Congress has not intended it to consider,' (2) 'entirely fail[ing] to consider an important aspect of the problem,' (3) 'offer[ing] an explanation for its decision that runs counter to the evidence before the agency,' or (4) offering an explanation that 'is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" (quoting *Citizens Telecomms. Co. of Minn., LLC v. FCC*, 901 F.3d 991, 1000 (8th Cir. 2018)).

Moreover, as explained, the FCC's interpretation of a text message being a call is not at odds with the statute. Because the TCPA does not define the term "call", courts interpret the word

"according to its 'ordinary, contemporary, common meaning.'" *Schaevitz v. Braman Hyundai, Inc.*, 437 F. Supp. 3d 1237, 1247 (S.D. Fla. 2019) "[T]he dictionary definition of 'call' [i]s 'to communicate with or try to get into communication with a person by a telephone.'" *Id.* (quoting *Satterfield*, 569 F.3d at 953-54). "Other courts have adopted this definition in the TCPA context." *Id.* (citing *Ashland Hosp. Corp. v. Serv. Employees Int'l Union*, 708 F.3d 737, 742 (6th Cir. 2013); *Fillichio v. M.R.S. Assocs., Inc.*, No. 09-61629-CIV, 2010 WL 4261442, at *3 (S.D. Fla. Oct. 19, 2010)).

The transmission of a text message to a consumer's telephone falls squarely within the definition of the word "call" as the purpose is to communicate with the person via their telephone. *See Satterfield*, 569 F.3d at 954 ("It is undisputed that text messaging is a form of communication used primarily between telephones."). Moreover, "[b]oth the FCC and the courts have recognized that the scope of the TCPA naturally evolves in parallel with telecommunications technology as it evolves, *e.g.*, with the advent of text messages." *Saunders v. Dyck O'Neal, Inc.*, 319 F. Supp. 3d 907, 911 (W.D. Mich. 2018).

The Court in *Wilson v. Skopos Fin., LLC*, 2025 U.S. Dist. LEXIS 138638, *10-13 (D. Or. July 21, 2025) denied an identical motion to dismiss holding:

> [T]he FCC's decision to include text messages is congruent with Congress's overarching goals for the TCPA. Congress enacted the TCPA "to address a growing number of telephone marketing calls and certain telemarketing practices thought to be an invasion of consumer privacy and even a risk to public safety." *2003 Rules & Reguls.*, 18 F.C.C. Rcd. at 14018. Section 227(c) specifically targets "the need to protect residential telephone subscribers' privacy rights to avoid receiving telephone solicitations to which they object." § 227(c)(1). With those goals in mind, the "basis" for the FCC's conclusion becomes abundantly clear: unsolicited text messages invade the privacy and disturb the solitude of their recipients. *See Van Patten v. Vertical Fitness Grp., LLC*, 847 F.3d 1037, 1043 (9th Cir. 2017). They should therefore be included within the purview of the DNC Registry's protections. It cannot be argued in good faith that text messages are so categorially different from phone calls that the former cannot be considered an invasion of consumer privacy when directed at numbers on the DNC Registry.. . . On this point, Defendant is without support. The Court concludes that unsolicited text messages sent in violation of the DNC Registry

can give rise to a cause of action under § 227(c)(5).

This Court should hold the same.

Defendant's request to exclude text messages from the protections afforded consumers under the TCPA also ignores that "the TCPA is a remedial statute, it should be construed to benefit consumers." *Gager v. Dell Fin. Servs., LLC*, 727 F.3d 265, 271 (3d Cir. 2013). The outcome Defendant requests – allowing companies to spam consumers with unwanted text messages even after requests for the messages to stop – would result in that harm. Congress intended for the privacy protections of the TCPA to cover new technologies by leaving the term "call" undefined thereby allowing the statute to continue to protect consumers. This Court should, respectfully, reject Defendant's myopic interpretation of the statute that would render it moot.

### e. The Second Circuit Court of Appeals and other Federal Courts in New York that have considered this question got it right.

Defendant's position would undermine that system if text messages were excluded from § 227(c)'s protections, telemarketers could simply bypass the Registry by shifting from voice calls to texts. That is precisely what has happened in the modern marketplace: while robocalls are now subject to tighter enforcement, robotexts have surged. As the FCC recognized in 2023, "[t]he rise of junk texts jeopardizes consumer trust in text messaging, frustrates consumers, and causes serious harm." *In re Targeting and Eliminating Unlawful Text Messages*, 38 FCC Rcd. 12247, 12256 ¶ 26 (2023). To read texts out of the TCPA would be to leave the dominant form of telemarketing today outside the very privacy protections Congress created.

Luckily for consumers, the federal courts in this District and Circuit have gotten the analysis correct. This starts with the Second Circuit Court of Appeals. First, in *Melito v. Experian Mktg. Solutions, Inc.,* 923 F.3d 85, 88 (2nd. Circ. 2019) ("The TCPA delegated the

authority to implement these requirements to the Federal Communications Commission (the "FCC"). *See* 47 U.S.C. § 227(b)(2). Although text messages are not explicitly covered under the TCPA, the FCC has interpreted the Act to cover them. *See In the Matter of Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 18 FCC Rcd. 14014, 14115 (July 3, 2003); *see also Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663, 667, 193 L. Ed. 2d 571 (2016) ('A text message to a cellular telephone, it is undisputed, qualifies as a 'call' within the compass of § 227(b)(1)(A)(iii).')")

Second, *Duran v. La Boom Disco, Inc.,* 955 F.3d 279, 280 (2nd Cir. 2020) continued, "[i]t is undisputed that '[a] text message to a cellular telephone . . . qualifies as a 'call' within the compass of [the TCPA].' *Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663, 667, 193 L. Ed. 2d 571 (2016). Moreover, an unwanted text message is, for standing purposes, an injury-in-fact. *See Melito v. Experian Mktg. Solutions, Inc.*, 923 F.3d 85, 93 (2d Cir. 2019) (noting that 'text messages, while different in some respects from the receipt of calls or faxes specifically mentioned in the TCPA, present the same 'nuisance and privacy invasion' envisioned by Congress when it enacted the TCPA')."

To be clear, the fact that the Second Circuit in *Melito* and *Duran* relied in part on the FCC's interpretation does not diminish the continuing force of those decisions. Those cases rested on the statutory text and Supreme Court precedent, and the FCC's interpretation was cited as additional support. Post-*Loper Bright*, that structure remains entirely sound: courts first look to the statute, then confirm with agency expertise where Congress has expressly delegated implementation authority. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 395 (2024) (explaining that courts must "respect [a] delegation" and review agency action for reasoned decision making under the APA). The TCPA is a textbook example of such a delegation,

authorizing the FCC to adopt the rules "most effective and efficient to accomplish the purposes" of the Act. 47 U.S.C. § 227(c)(1)(E). Thus, while the FCC's views are no longer binding under Chevron, they continue to warrant substantial weight under *Skidmore v. Swift & Co.*, 323 U.S. 134, 139–40 (1944), particularly where the agency's position has been consistent for decades, rooted in technical expertise, and repeatedly ratified by Congress through amendments like the TRACED Act. Post-*Loper* principles therefore still counsel respect for the FCC's reasoned judgment, which aligns with both the statute's plain meaning and the Second Circuit's own precedents.

It is no surprise then that "in this Circuit, district courts have treated text messages as 'calls' within the meaning of the TCPA. *See Melito v. Am. Eagle Outfitters, Inc.,* No. 14 CV 02440, 2015 U.S. Dist. LEXIS 160349, 2015 WL 7736547, at *4 (S.D.N.Y. Nov. 30, 2015) ('The plain language of section 227(b)(1)(A)(iii) imposes liability upon persons that 'make' a telephone call or text.'); *see also Jackson v. Caribbean Cruise Line, Inc.,* 88 F. Supp. 3d 129, 135 (E.D. NY. 2015)." *Krady v. Eleven Salon Spa*, 2017 U.S. Dist. LEXIS 120139, *7 (E.D. N.Y. 2017). "Courts have consistently recognized that a text message constitutes a call within the meaning of the statute. *See, e.g.*, *Rotberg v. Jos. A. Bank Clothiers, Inc.*, 345 F. Supp. 3d 466, 474 (S.D.N.Y. 2018); *Metten v. Town Sports Int'l, LLC*, No. 18-CV-4226 (ALC), 2019 U.S. Dist. LEXIS 47138, 2019 WL 1299939, at *2 (S.D.N.Y. Mar. 21, 2019). Therefore, the text message that Plaintiff received qualifies as a call for which TCPA liability may lie." *Bank v. Simple Health Plans LLC*, 2019 U.S. Dist. LEXIS 215228, *13 (E.D. NY. 2019).

The Second Circuit and district courts within it have spoken with one voice: text messages qualify as "calls" under the TCPA and are subject to the same restrictions as voice solicitations. Excluding texts from the Registry would nullify Congress's protections, allow

telemarketers to exploit the dominant form of communication today, and erode consumer trust. Because the statutory text, the FCC's consistent interpretation, and binding precedent all confirm that texts fall within the TCPA's scope, Defendant's attempt to carve out an exception must be rejected. The Registry continues to protect numbers, not loopholes.

## II.  The Text Messages Plaintiff Received Were Classic "Telephone Solicitations" Under Section 227(c)

As to their second reasons for why they claim this case ought to be dismissed, the Defendant claims that the Plaintiff has failed to allege that he received the texts were not "telephone solicitations." The court can easily dispense this argument which ignores the black and white content of the text messages. The plain text of the text messages, as shown in the Complaint invoked a "recent application" even though Plaintiff had never applied for any loan with Better Mortgage (ECF No. 16. ¶¶ 31–34) ("Hi Joseph, this is Chloe from Better Mortgage. Following up on your recent application. We'd like to help you move forward. NMLS #330511."). The Amended Complaint explains that the references to an application were pretextual and crafted to entice Plaintiff into beginning the loan process with Better Mortgage (Id. ¶¶ 35–44). The inclusion of Better Mortgage's federally required NMLS identifier underscores that the texts were commercial solicitations, not informational (Id. ¶¶ 29–30).

These messages fall squarely within the FCC's definition of a "telephone solicitation": the initiation of a telephone call or message for the purpose of encouraging the purchase of property, goods, or services. 47 C.F.R. § 64.1200(f)(15). Moreover, "[n]either the statute nor the regulations require an explicit mention of a good, product, or service where the implication is clear from the context." *Chesbro v. Best Buy Stores, L.P.*, 705 F.3d 913, 918 (9th Cir. 2012); *see also Golan v. Veritas Entm't, LLC*, 788 F.3d 814, 820 (8th Cir. 2015) ("Notwithstanding the plain language of the regulations, defendants argue that we should consider only the content

of the calls in determining whether they were telemarketing. We refuse to do so."). Indeed, a text message "that encourages future purchasing activity may be a telephone solicitation, even if the sales pitch is not explicitly contained in the call itself." *Orea v. Nielsen Audio, Inc.*, No. 14–cv–04235–JCS, 2015 WL 1885936, at *3 (N.D. Cal. Apr. 24, 2015).

The texts promoted Better Mortgage's loan origination services and encouraged Plaintiff to take the next step in the mortgage application process—conduct that directly advances Defendant's business model and generates revenue only when consumers apply for and close loans (ECF No. 16 at ¶¶ 35–44, 50–60). When construing the allegations in a light most favorable to the Plaintiff, it is unclear how such content does not qualify as a call made to "encourage[] the purchase or rental of, or investment in . . . services". 47 C.F.R. §§ 64.1200(c)(2), (f)(15). These allegations plausibly suggest calls made to encourage the purchase of mortgage services and thus are telephone solicitations. *See Miholich v. Senior Life Ins.*, 2022 U.S. Dist. LEXIS 23981, *15-16 (S.D. Cal. Feb. 10, 2022) (holding as sufficient allegations where "[t]he FAC alleges that the text messages advertised 'Financed Leads,' contained a link to webinar provided by Defendant, and were 'an attempt to promote or sell Defendant's services.'"). Indeed, while the Defendant claims that its text messages were purely informational, they are also clearly trying to promote a future purchase, which even at the summary judgment stage is sufficient to have a marketing purpose. *See e.g. Carroll v. SGS N. Am., Inc.,* No. 16-537-SDD-RLB, 2017 U.S. Dist. LEXIS 154170, at *9 (M.D. La. Sep. 21, 2017) ("the Court finds that the purpose for the phone calls was dual - customer service and to solicit future sales and revenues.").

Courts recognize that determining whether a message qualifies as a solicitation does not turn on labels chosen by the sender, but on whether the communication is plausibly tied to

promoting the purchase of services. *See Sandusky Wellness Ctr., LLC v. Medco Health Sols., Inc.,* 788 F.3d 218, 222 (6th Cir. 2015) ("a fax that promotes the availability of a product or service is an advertisement even if it does not contain an explicit sales pitch"). So too here, the messages' repeated invocation of a "recent application" and the invitation to "move forward" or "finish it together" cannot plausibly be read as neutral informational updates. They are structured to draw a consumer into Defendant's loan origination funnel. Further, the inclusion of Defendant's NMLS identifier (#330511) eliminates any doubt. *See, e.g.*, *Whittaker v. Freeway Ins. Servs. Am., LLC*, No. CV-22-8042-PCT-DGC, 2023 WL 167040, at *2 (D. Ariz. Jan. 12, 2023) ("Except for encouraging the purchase of its products, it is hard to imagine why an insurance company would contact a consumer not already insured by it and state that it looked forward to saving the consumer money, as did the recorded message in this case.").

Federal and state regulations require lenders to include this identifier in loan solicitations and marketing communications, not in casual texts or status reminders. That requirement alone demonstrates that the communications were solicitations. *See Biggerstaff v. Ally Fin., Inc.,* 2016 WL 6090718, at *3 (D.S.C. Oct. 19, 2016) (finding messages bearing regulatory disclosures and identifiers to be "commercial by nature" and within the TCPA's ambit). The contrary authorities are simply not on point, particularly because none of the authorities cite to the actual text of the messages, as here. For example, in *Eggleston v. Reward Zone USA LLC*, 2022 U.S. Dist. LEXIS 20928 (C.D. Cal. Jan. 28, 2022), the plaintiff "simply relie[d] on conclusory labels such as "advertisement" or "promotion" without any supporting factual detail." *Id.* at * 17.  So too in *Dahadah*, *Horton*, and *Weingrad*, where no content was pled, unlike here, rendering those cases easily distinguishable.

In sum, Defendant's texts were not stray status updates, but carefully crafted solicitations designed to prompt consumer engagement in its mortgage services pipeline. The allegations set out in the Amended Complaint, coupled with the actual text content and the inclusion of Defendant's NMLS identifier, leave no plausible reading other than that these were "telephone solicitations" within the meaning of Section 227(c). At this stage, Plaintiff has more than met his burden to allege a cognizable claim, and Defendant's contrary arguments are nothing more than an effort to narrow the TCPA beyond what its text and purpose allow.

### III.    Plaintiff Plausibly Pleads the Potential for Treble Damages

Defendant's request to dismiss Plaintiff's claim for treble damages ignores the plain allegations of the Amended Complaint and misstates the governing standard. The TCPA authorizes treble damages "[i]f the court finds that the defendant willfully or knowingly violated" the statute. 47 U.S.C. § 227(c)(5)(C). Courts interpreting this language have consistently held that "willful" in the TCPA context does not require proof of malicious intent, but simply that the defendant's conduct was intentional or volitional rather than inadvertent. See *Alea London Ltd. v. Am. Home Servs., Inc.*, 638 F.3d 768, 776 (11th Cir. 2011); *Wakefield v. ViSalus, Inc.*, No. 3:15-cv-1857-SI, 2019 U.S. Dist. LEXIS 104862, at *3 (D. Or. June 24, 2019).

Here, Plaintiff more than plausibly alleges willful or knowing conduct. The Amended Complaint pleads that Defendant knew, or should have known, that Plaintiff's number was registered on the National Do Not Call Registry, yet deliberately failed to scrub that number from its marketing campaigns (ECF No. 16 at ¶ 15). Defendant deliberately chose not to implement the most basic compliance measures—such as routine list scrubbing against the Registry—despite longstanding FCC rules mandating such practices and the ready availability of

industry-standard tools. This failure was not a technical oversight; it was an intentional business choice to prioritize marketing reach over legal compliance.

These facts plausibly show intentional and knowing conduct. Courts have repeatedly found that allegations of persistent telemarketing in the face of obvious red flags suffice to plead willfulness. See *Charvat v. NMP, LLC*, 656 F.3d 440, 449 (6th Cir. 2011) (willful violation requires only that "the defendant knew that it was engaging in the conduct that violated the statute"). Taken as true, Plaintiff's allegations demonstrate that Defendant acted intentionally, with disregard of the Registry, and that its repeated violations were not accidental. Defendant cannot evade treble-damages exposure by rebranding deliberate conduct as inadvertent oversight. At the pleading stage, Plaintiff is required only to allege facts that plausibly show intentional conduct, and he has done so. Any dispute over Defendant's intent is a fact question for discovery, not a pleading defect. See *Roylance v. ALG Real Estate Servs., Inc.*, 2015 WL 1522244, at *4 (N.D. Cal. Mar. 16, 2015) (denying dismissal of treble damages claim; whether conduct was knowing was "a factual dispute inappropriate for resolution on a motion to dismiss").

### IV.    The Class Allegations Should be Addressed on a Full Record, not Determined Prior to any Discovery.

As a fallback to dismissal, Defendant asks this Court to strike Plaintiff's class allegations. This request is premature as "motions to strike are viewed with disfavor and infrequently granted." This is particularly true in the context of motions to strike class allegations where, as here, no discovery has taken place.". *Jaffery v. Health Ins. Plan of Greater N.Y.,* 2024 U.S. Dist. LEXIS 168669, *7-8 (N.D. NY).

Plaintiff's class allegations are grounded in objective, ascertainable criteria: individuals who received multiple solicitation text or voice calls from Better Mortgage despite having their

numbers registered on the National Do Not Call Registry for at least thirty days (ECF No. 16 at ¶ 20). These allegations mirror those approved by other courts certifying TCPA classes. See, e.g., *Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 656–58 (4th Cir. 2019); *Cordoba v. DIRECTV, LLC*, 942 F.3d 1259, 1276–77 (11th Cir. 2019). The uniform nature of Defendant's mass-texting campaigns, its use of a single NMLS identifier, and centralized recordkeeping of the basis to contact individuals will drive Rule 23 analysis.

Courts have repeatedly emphasized that the class certification inquiry ordinarily requires discovery, not dismissal on the pleadings. As the Supreme Court has explained, "it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013). Following this guidance, district courts have denied nearly identical motions to strike in TCPA cases. See, e.g., *Stemke v. Marc Jones Constr., LLC*, 2021 U.S. Dist. LEXIS 181916, at *7–8 (M.D. Fla. 2021) (denying motion to strike, explaining that alleged defects in class definition could be revisited at certification). Defendant's argument focuses on a potential affirmative defense of consent or established business relationship (of which they've produced no evidence to support) to assert that the action in its entirety is incapable of being maintained as a class action. In rejecting the same argument previously in a TCPA case, another Court held:

> The Court finds that the defendant's motion to strike the class allegations is premature before plaintiff can develop the factual record through discovery. Loan Depot's citation of consent as a potential affirmative defense is insufficient to warrant striking the putative class solely on the pleadings. The motion to strike class allegations will, therefore, be denied.

*Rosenberg v. LoanDepot.com LLC,* 435 F. Supp. 3d 308, 318 (D. Mass. 2020).

Even though Plaintiff does not believe that the Defendant obtained the appropriate prior express written consent for its calls, the Plaintiff made a conscious decision to not include language about individuals who have not provided their "prior express written consent" in the

25

class definition, as other federal courts *have found that* to be an impermissible fail-safe class in TCPA cases. Nor does the determination of the consent issue necessitate thousands of individual mini-trials as the Defendant claims. Courts do not see consent issues as problematic from a class certification perspective, particularly when there are uniform issues with the offered consent evidence. *Berman v. Freedom Fin. Network, LLC*, 400 F. Supp. 3d 964, 972 (N.D. Cal. 2019); *Zyburo v. NCSPlus, Inc.*, 44 F. Supp. 3d 500, 504 (S.D.N.Y. 2014).

Nor do arguments about "residential use" justify striking the allegations. Determining whether putative class members' numbers are residential is a factual inquiry suited for discovery and expert analysis, not a pleading-stage dismissal. *See, e.g., Lenorowitz v. Mosquito Squad of Fairfield & Westchester Cty.*, No. 3:20-cv-01922 (JBA), 2022 U.S. Dist. LEXIS 170384, at *13-14 (D. Conn. Sep. 21, 2022) ("Defendant's arguments boil down to this: Plaintiff has not demonstrated that the putative class includes only people who were called on applicable phone lines, not phones used for business purposes. However, Defendant's concern is not with the ascertainability of the class, but instead with the feasibility of ensuring the class members meet the class definition. Plaintiff proposes resolving ambiguities by subpoena to the phone companies or obtaining information by a questionnaire or affidavit as part of the class notice process …. As the affidavit or questionnaire process has been approved by courts handling this very issue in TCPA class actions, the Court adopts it for this case. *See e.g., Braver v. Northstar Alarm Servs., LLC*, 329 F.R.D. 320, 329 (W.D. Okla. 2018) ('[I]f issues need to be tried to determine whether a line is a business line or a residential line, those issues could be resolved by asking class members whether the line in question is a residential line during the class notification process, or, in any event, through a standardized and efficient claims process at a later stage').").

The cases cited by Defendant do not compel a different result. In *Payne v. Sieva Networks, Inc.*, 347 F.R.D. 224, 227 (N.D. Cal. 2024), the court struck class allegations because the defendant exclusively targeted trucking companies using numbers publicly registered with the Department of Transportation, and the plaintiff himself admitted to registering his number for business use. That factual scenario bears no resemblance to this case, where Better Mortgage targeted consumers for mortgage loans, Plaintiff has never used his number for business, and there is no evidence that any putative class member did either. Far from supporting Defendant's motion, *Payne* illustrates that TCPA DNC classes are routinely certified where, as here, the challenged conduct is directed toward consumers.

Third, the provisions of the TCPA do not require that one *personally register* their number on the Do Not Call Registry because that fact would be *impossible to prove*, as the FTC is neither authorized to nor collects such information. Not surprisingly several courts have rejected this argument and only one has adopted it, *Rombough v. Robert D. Smith Ins. Agency, Inc.*, No. 22-CV-15-CJW-MAR, 2022 WL 2713278, at *2 (N.D. Iowa June 9, 2022). The FCC's regulations permit a "residential telephone subscriber" to register "his or her telephone number" on the Registry. 47 C.F.R. § 64.1200(c)(2). Once a telephone number is registered on the Registry, the "registrations must be honored indefinitely, or until the registration is cancelled by the consumer of the telephone number is removed by the database administrator." *Id*. Previously, such registrations had to be renewed, but this hasn't been the case since at least the mid-2000s. Therefore, in addition to requiring the government to collect information it isn't even legally authorized to collect, *Rombough* purports to require some TCPA plaintiffs to do the impossible–personally *re*register a number already on the Registry. It has been disagreed with by every other court to consider it and its premises. *See, e.g.*, *Watson*, No. 20 CIV. 4572 (LGS), 2022 WL

4586407, at *9 (S.D.N.Y. Sept. 29, 2022) (holding that "whether each class member registered their number on the NDNCR is irrelevant."); *Klassen v. Solid Quote LLC,* No. 23-CV-00318-GPG-NRN, 2023 WL 7544185, at *4 (D. Colo. Nov. 14, 2023); *D.G. v. William W. Siegel & Assocs.,* 791 F. Supp. 2d 622, 625 (N.D. Ill. 2011) ("Plaintiff is the regular user and carrier of the phone, Plaintiff qualifies as a "called party" under the TCPA."). *Rombough* was most notably rejected in *Callier v. Am.-Amicable Life Ins. Co. of Texas,* No. EP-22-CV-00018-FM, 2022 WL 17732717, at *5 (W.D. Tex. Oct. 18, 2022), where the Western District of Texas called the argument underlying the *Rombough* decision one that "borders on the frivolous." The *Callier* court went on to state:

> *Rombough's* nitpicky formality is thoroughly unpersuasive. The DNC is not auto-populated: it is a list of phone numbers for individuals who have requested that telemarketers not contact them. While it is possible a third-party may have registered a plaintiff's phone number before a plaintiff acquired it, this is unlikely given how infrequently people change numbers. And it is particularly unlikely here given Plaintiff's well-documented desire that telemarketers respect his registration with the DNC.

*Id.* at *6 (cleaned up). As a result, there is no requirement that an individual personally register their number on the Do Not Call Registry.

Finally, Defendant's contention that determining whether its text messages "promoted Better Mortgage Corp. goods or services" requires individualized inquiry ignores both the allegations of the Amended Complaint and the structure of its own telemarketing campaigns. Plaintiff specifically pleads that the messages were uniformly branded, contained Better Mortgage's NMLS identifier and were sent to induce the recipient into applying for a mortgage loan (ECF No. 16 ¶¶ 16–19, 29–34, 45–47, 50–60). These allegations describe a standardized campaign—messages generated and transmitted through a centralized platform, with identical branding and uniform commercial purpose. Whether the messages "promoted Better Mortgage's

goods or services" is therefore a question subject to common proof, not individualized mini-trials.

Courts evaluating similar arguments have repeatedly held that the "purpose" of calls or texts can be demonstrated through uniform content and telemarketing records, and does not require recipient-by-recipient analysis. See *Chesbro v. Best Buy Stores, L.P.*, 705 F.3d 913, 918 (9th Cir. 2012) (robocalls were solicitations where content encouraged future purchasing, regardless of how each recipient perceived them); *Miholich v. Senior Life Ins. Co.*, 2022 U.S. Dist. LEXIS 23981, at *15–16 (S.D. Cal. Feb. 10, 2022) (allegations that messages advertised defendant's services sufficient without inquiry into each recipient's experience),

Defendant's reliance on supposed "individual inquiries" is also misplaced as a matter of law. The TCPA's definition of "telephone solicitation" is objective and turns on the purpose of the message, not the recipient's subjective interpretation. 47 C.F.R. § 64.1200(f)(15). Thus, whether a message is a solicitation can be answered by examining the campaign's content, scripts, and purpose, all of which are common evidence in Defendant's possession. As other TCPA courts have recognized, the statute does not require a case-by-case inquiry into each recipient's call but allows proof of solicitation through representative evidence and uniform marketing records. See *Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 657 (4th Cir. 2019) (affirming DNC class certification because whether calls were solicitations was resolved by common evidence of campaign records).

In sum, Plaintiff's class allegations are neither facially defective nor incapable of certification. They track objective criteria, rely on common proof such as Defendant's centralized text campaigns and consent logs, and are consistent with the types of TCPA classes repeatedly certified by federal courts. Defendant's attempt to strike these allegations now is not

29

supported by law or fact. The appropriate time to test them is at class certification, after discovery has developed the evidentiary record.

## Conclusion

The TCPA's DNC regime protects people, not transmission formats. Congress defined "telephone solicitation" to include the initiation of a "telephone call or message," 47 U.S.C. § 227(a)(4), and created a private right of action for persons who receive such solicitations in violation of the DNC rules, id. § 227(c)(5). The Supreme Court has recognized that a text message qualifies as a "call," and the Second Circuit has repeatedly treated unwanted texts as covered communications that inflict concrete injury. See *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 156–57 (2016); *Melito v. Experian Mktg. Sols., Inc.*, 923 F.3d 85, 88–93 (2d Cir. 2019); *Duran v. La Boom Disco, Inc.*, 955 F.3d 279, 283–84 (2d Cir. 2020). Plaintiff's allegations track the statute and regulations: his number was on the National Do Not Call Registry, and he nevertheless received multiple, uniformly branded solicitation texts from Better Mortgage that invoked a fictitious "recent application" to induce him to begin the loan process (ECF No. 16 ¶¶ 15–19, 29–34, 45–47, 50–60). That is precisely what § 227(c) forbids.

Defendant's remaining Rule 12 arguments fail for the same reasons. The Amended Complaint plausibly alleges solicitation content as defined by 47 C.F.R. § 64.1200(f)(15). It also plausibly pleads knowing or willful conduct supporting treble damages, given Defendant's failure to scrub against the DNC Registry and its deliberate use of a pretextual "application" hook despite having no such application in its own records. And striking the class allegations now would short-circuit Rule 23: whether common proof (campaign content, centralized consent logs, and DNC-scrubbing practices) will predominate is a discovery-backed certification question, not a pleading defect.

30

Date: October 2, 2025

*/s/ Anthony Paronich*
Anthony I. Paronich, *pro hac vice*
Paronich Law, P.C.
350 Lincoln Street, Suite 2400
Hingham, MA 02043
Tel: (617) 485-0018
anthony@paronichlaw.com

*Counsel for Plaintiff and the proposed class*